**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| UNITED STATES of AMERICA, ex rel. [RELATORS UNDER SEAL], | ) ) ) | Civil Action No. _____ *SEALED* |
| *Plaintiffs-Relators,* | ) ) | **FILED UNDER SEAL** **DO NOT PLACE ON PACER** |
| vs. | ) ) ) | |
| [DEFENDANTS UNDER SEAL], | ) ) ) | |
| *Defendants.* | ) ) ) ) ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

# FILED UNDER SEAL

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**COLUMBIA DIVISION**

| | |
|---|---|
| UNITED STATES of AMERICA, ex rel. KRISTI EMERSON and LEEANN TUESCA, )<br><br>*Plaintiffs-Relators,* )<br><br>vs. )<br><br>SIGNATURE HEALTHCARE, LLC; LP COLUMBIA, LLC d/b/a SIGNATURE HEALTHCARE OF COLUMBIA; SIGNATURE HEALTHCARE CONSULTING SERVICES, LLC; SIGNATURE REHAB SERVICES, LLC and SIGNATURE PAYROLL SERVICES, LLC, )<br><br>*Defendants.* )  | Civil Action No. _____ *SEALED*<br><br>**FILED UNDER SEAL**<br>**DO NOT PLACE ON PACER**<br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

### RELATORS' SEALED COMPLAINT PURSUANT TO
### THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §3729, *ET SEQ.*

Relators Kristi Emerson and LeeAnn Tuesca (referred to herein as "Relators"), on behalf of themselves and the United States of America, bring this action against Signature Healthcare, LLC; LP Columbia, LLC d/b/a Signature Healthcare of Columbia; Signature Healthcare Consulting Services, LLC; Signature Rehab Services, LLC; and Signature Payroll Services, LLC (collectively "Defendants" or "Signature"), for violations of the Federal False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq.*, to recover all damages, civil penalties and other recoveries provided for under the FCA. For their cause of action, Relators aver as follows:

### SUMMARY OF THE ACTION

1.      Relators Kristi Emerson and LeeAnn Tuesca, on behalf of the United States and themselves, bring this case to challenge Defendants' ongoing scheme to defraud the United

- 1 -

States.  Specifically, Defendants – who collectively operate a series of skilled nursing facilities – have schemed to defraud and have in fact defrauded the United States by (1) scheduling and performing unnecessary physical, occupational, and speech-language therapy for the sole purpose of billing for those services; (2) billing the United States for services that were never performed; and (3) failing to bill co-pays for services rendered to Medicare Part B beneficiaries.

2.      First, Defendants regularly and knowingly required their physical, occupational, and speech-language therapists to perform unnecessary therapy so that Defendants could bill Medicare for those services.  For beneficiaries covered by Medicare Part A, Medicare reimburses skilled nursing facilities on a per diem basis for all services rendered.  One of the most important factors that determines the rate of this per diem payment is the amount of therapy provided by the facility to the patient.  Defendants have knowingly provided unnecessary therapy to these Part A beneficiaries for the sole purpose of increasing the total minutes of therapy and thereby increasing the per diem rates paid by Medicare.  For beneficiaries covered by Medicare Part B, Medicare pays on a per-unit basis, with each "unit" of therapy being equal to 15 minutes of therapy provided.  Defendants have knowingly provided unnecessary therapy to these Part B beneficiaries and then billed Medicare for that time.

3.      Second, Defendants have billed Medicare for services that they have not actually provided.  Specifically, Defendants have submitted claims to Medicare seeking reimbursement for therapy that Defendants claim to have provided to their residents, but that Defendants have not actually provided.

4.      Third, Defendants have failed to bill co-pays for its Part B patients, in violation of the federal Anti-Kickback Statute.  This failure to bill for co-pays is directly related to Defendants' scheme to provide and bill for unnecessary therapy.  For many elderly patients

covered by Medicare Part B, there will be a family member or close friend who holds power of attorney, and who will typically be responsible for paying that patient's bills. That family member or close friend will also usually be in a position to know whether physical, occupational, or speech-language therapy is necessary for a patient, and to challenge any co-pays being billed for unnecessary therapy. Accordingly, by not billing co-pays to its Part B beneficiaries, Defendants were able to perform and bill Medicare for these unnecessary services without detection from the friends or family of the patient.

5.      Relators Emerson and Tuesca reported these schemes to defraud internally, but Defendants refused to take any meaningful corrective action. In fact, Defendants have retaliated against both Relators for raising these issues.

## PARTIES

6.      Relator Kristi Emerson ("Emerson") is a current employee of Signature and has standing to bring this action pursuant to 31 U.S.C. §3730(b)(1). Relators' Complaint is not based on any other prior disclosures of the allegations or transactions discussed herein in a criminal, civil, or administrative hearing, lawsuit or investigation, or in a Government Accounting Office or Auditor General's report, hearing, audit or investigation, or from the news media.

7.      Relator LeeAnn Tuesca ("Tuesca") is a current employee of Signature and has standing to bring this action pursuant to 31 U.S.C. §3730(b)(1). Relators' Complaint is not based on any other prior disclosures of the allegations or transactions discussed herein in a criminal, civil, or administrative hearing, lawsuit or investigation, or in a Government Accounting Office or Auditor General's report, hearing, audit or investigation, or from the news media.

- 3 -

8.      Since approximately September of 2014 and continuing to the present, Relators have communicated and disclosed evidence of fraud to agents acting on behalf of the Office of the Inspector General for the Department of Health and Human Services, making Relators original sources with respect to that evidence.

9.      Relators bring this action on behalf of United States of America (hereafter, "United States"). The United States is a plaintiff on behalf of the U.S. Department of Health & Human Services ("HHS"), the Centers for Medicare & Medicaid Services ("CMS"), and other federally funded health care programs, including Medicare.

10.     Defendant Signature Healthcare, LLC ("Signature Healthcare" or "Signature Corporate"), is a Delaware limited liability company with its principal address at 12201 Bluegrass Parkway, Louisville, Kentucky 40299. At all times relevant to this Complaint, Signature Corporate has served as the corporate parent of the other Signature defendants in this case.

11.     Defendant LP Columbia, LLC d/b/a Signature Healthcare of Columbia ("LP Columbia") is a Delaware limited liability company with its address at 12201 Bluegrass Parkway, Louisville, Kentucky 40299. At all times relevant to this Complaint, LP Columbia operated the 181-bed nursing facility Signature HealthCARE of Columbia ("Signature Columbia"), located at 1410 Trotwood Avenue, Columbia, Tennessee 38401. Relators have each had significant work experience at Signature Columbia. Relator Emerson has worked as a certified occupational therapy assistant at Signature Columbia for approximately thirteen years, including a period of approximately five years before Signature acquired it. Relator Tuesca has

worked as a licensed occupational therapist for approximately five years, first from 2006 to 2008, and again from 2012 to the present.[1]

12.     Defendant Signature Healthcare Consulting Services, LLC ("Signature Consulting") is a Delaware limited liability company with its principal address at 12201 Bluegrass Parkway, Louisville, Kentucky 40299.  At all times relevant to this Complaint, Signature Consulting was responsible for ensuring that Signature rehabilitation facilities, including the Signature Columbia facility where Relators worked, complied with applicable laws and regulations.

13.     Defendant Signature Rehab Services, LLC ("Signature Rehab"), is a Delaware limited liability company with its principal address at 12201 Bluegrass Parkway, Louisville, Kentucky 40299.  At all times relevant to this Complaint, Signature Rehab has been responsible for providing physical therapy, occupational therapy, and speech-language therapy to patients at Signature rehabilitation facilities, including the Signature Columbia facility where the Relators worked.

14.     Defendant Signature Payroll Services, LLC ("Signature Payroll") is a Delaware limited liability company with its principal address at 12201 Bluegrass Parkway, Louisville, Kentucky 40299.  At all times relevant to this Complaint, Signature Payroll has been the Signature entity responsible for actually paying Signature employees, including Relators Emerson and Tuesca.

---

[1]     Although Relator Emerson is technically an occupational therapist assistant, for ease of reference, Relators Emerson and Tuesca will often be identified in this complaint collectively as "occupational therapists."

15.    At all times relevant to this Complaint, these five Signature defendants (collectively "Signature" or "Defendants") operated as an integrated enterprise and the fraudulent conduct described herein is attributable to each of them.

## JURISDICTION AND VENUE

16.    Jurisdiction is founded upon the FCA, 31 U.S.C. §3729, *et seq*., specifically 31 U.S.C. §3732(a) and (b), and also upon 28 U.S.C. §§1331 and 1345.

17.    Venue in the Middle District of Tennessee is appropriate under 31 U.S.C. §3732(a) in that, at all times material to this civil action, one or more of the defendants transacted business in the Middle District of Tennessee or submitted or caused the submission of false claims in the Middle District of Tennessee.

18.    Relators are providing the United States with a full written disclosure of substantially all material facts, as required by the FCA, 31 U.S.C. §3730(b)(2).

## APPLICABLE LAW

### I.    THE FEDERAL FALSE CLAIMS ACT

19.    The FCA provides, in part, that any entity that (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the United States for damages and penalties.  31 U.S.C. §3729(a)(1)(A)-(B). Additionally, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.  31 U.S.C. §3729(a)(1)(G).

- 6 -

20.     A person acts "knowingly" under the FCA when he or she "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. §3729(b)(1)(A).  No proof of specific intent to defraud is required by the FCA.  31 U.S.C. §3729(b)(1)(B).

21.     Under the FCA, an "obligation" is defined as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. §3729(b)(3).

22.     FCA violations may result in civil penalties of between $5,500 and $11,000 per false claim, plus three times the amount of damages sustained by the Government as a result of the illegal conduct.  31 U.S.C. §3729(a).

## II.     THE FEDERAL ANTI-KICKBACK STATUTE

23.     The federal Anti-Kickback Statute ("AKS"), 42 U.S.C. §1320a-7b(b), arose out of congressional concern that remuneration provided to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or harmful to a vulnerable patient population.  To protect the integrity of the Medicare and Medicaid programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form.  First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §242(b) and (c); 42 U.S.C. §1320a-7b;  Medicare-Medicaid Anti-fraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

24.     The AKS makes it a felony for any person or entity to offer or pay remuneration, in cash or in kind, directly or indirectly, to induce a person:

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. §1320a-7b(b)(2).

25.     Violation of the statute also can subject the perpetrator to exclusion from participation in federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid. 42 U.S.C. §1320a-7a(a) and (a)(7).

26.     The AKS was recently amended to expressly state what many courts had already held, namely, that a violation of the AKS constitutes a "false or fraudulent" claim under the FCA. 42 U.S.C. §1320a-7b(g).

27.     Moreover, Federal Regulations explicitly state that "remuneration" under the statute includes "the waiver of coinsurance and deductible amounts." 42 C.F.R. §1003.101.

## III.   MEDICARE PAYMENTS FOR NURSING HOME RESIDENTS UNDER MEDICARE PARTS A & B

### A.    Payments under Part A

28.     Part A of the Medicare Program provides benefits to participants that cover, among other services, skilled nursing provided in long-term-care ("LTC") nursing facilities for the first 100 days of the beneficiary's stay.

- 8 -

29.     During this 100-day period, Medicare Part A makes prospective per diem payments to the skilled nursing facility that represent payment in full for all services rendered to that beneficiary within the relevant time period. 42 C.F.R. §413.335(b).

30.     The amount of the prospective per diem payment for a particular patient is calculated through a formula that factors in the needs of that patient and the level and amount of care provided by the facility.  42 C.F.R. §413.337(c).

31.     Accordingly, while the prospective per diem payments are not designed to compensate skilled nursing facilities for their exact costs, they are designed to compensate at higher rates for patients that require higher levels of care.

32.     Under this system, the skilled nursing facilities must conduct periodic patient assessments to record any changes in patient status or the nature or amount of services being provided.  42 C.F.R. §413.343.  The data collected in these assessments must be captured and submitted in a form known as the Minimum Data Set ("MDS"), and the data in the MDS serves as the basis for establishing prospective per diem payments for that patient.

33.     Each MDS is designed to capture patient data based on a seven-day look back.  In other words, starting on the date of the assessment (*i.e.* the assessment reference date or "ARD") the MDS is used to record the patient's health and the services provided by the facility during the past seven days.  This data is then used as the basis of prospective per diem payments to the facility starting during that assessment period.

34.     So, for example, if a facility performs a patient assessment on day fourteen (7) of that patient's stay, the data from that assessment will determine how much the facility gets paid per day for that patient for the first seven days that patient is in the facility.

- 9 -

35.     For each of these assessment periods, a Part A patient in a skilled nursing facility will be assigned a three-letter Resource Utilization Group ("RUG") code that roughly reflects the level and amount of service being provided to that patient during that assessment period.  *See* CMS, *Medicare Claims Processing Manual ("Claims Processing Manual")*, Ch. 6 – SNF Inpatient Part A Billing and SNF Consolidated Billing, §30.6.3.  The specific RUG code assigned to a patient determines the rate of the prospective per diem payment from that assessment date until the next assessment date.

36.     The RUG code, in turn, is determined from three basic components: (1) a nursing component; (2) a therapy component; and (3) a non-case-mix adjusted component.  *Claims Processing Manual*, Ch. 6, §30.6.3.

37.     Part A patients who receive any amount of rehabilitative therapy during the seven-day assessment period (*i.e.* the seven-day look-back period starting from the assessment reference date) will have the letter "R" as the first letter in their RUG code.  *See CMS's RAI Version 3.0 Manual*, Ch. 6 – Medicare SNF PPS at 21-26.

38.     The second letter of the RUG code is based on the amount of therapy provided by the facility to that patient during the seven-day assessment period.  There are five possible letters, corresponding to five different levels of therapy:

|  |  |
|---|---|
| U = Ultra High | (720 total minutes in the past 7 days) |
| V = Very High | (500 total minutes in the past 7 days) |
| H = High | (325 minutes in the past 7 days) |
| M = Medium | (150 minutes in past 7 days) |
| L = Low | (at least 45 minutes in past 7 days) |

39.     The final letter of the RUG score is based on quality-of-life issues, such as the patient's ability to dress or feed herself.

- 10 -

40.     Under this model, patients who receive 720 minutes or more of therapy during the seven-day reference period are categorized as "RU," and CMS pays higher per diem rates for these patients than it does for patients categorized as RV, RH, RM, or RL.

**B.     Payments under Part B**

41.     Medicare Part B is a voluntary insurance program providing supplemental medical insurance benefits to aged and disabled enrollees.  42 U.S.C. §1395j.

42.     For covered beneficiaries in LTC nursing facilities, Medicare Part B will cover certain forms of reasonable and necessary patient therapy after the beneficiary has exhausted Part A coverage for those services.

43.     Specifically, Part B will cover outpatient physical therapy services, outpatient occupational therapy services, and outpatient speech-language pathology services.  42 U.S.C. §1395k(a)(2)(C); *see also Claims Processing Manual*, Ch. 7, §10.1.

44.     Medicare will typically pay for 80% of the cost of these therapy services, with the beneficiary responsible for the remaining 20%.  *See* 42 U.S.C. §§1395l(a)(8), 1395m(k).

45.     Medicare Part B will not pay for any expense that is "not reasonable and necessary for the diagnosis and treatment of illness or injury or to improve the functioning of a malformed body member."  42 U.S.C. §1395y(a)(1)(A).

## BACKGROUND FACTS

46.     Signature Healthcare operates 126 long-term health and rehabilitation centers in 10 states, including 30 facilities within the State of Tennessee. *See* ltcrevolution.com/communities (last visited March 25, 2015).

47.     During all times relevant to this Complaint, Relators have worked as occupational therapists at Signature Columbia, a 181-bed nursing facility located at 1410 Trotwood Avenue, Columbia, Tennessee.

48.     Signature Columbia accepts Medicare, Medicaid and privately insured patients. However, at any given time, the majority of its patients are covered, at least in part, by Medicare.

49.     In their respective roles as occupational therapists, Relators Emerson and Tuesca have been responsible for working with patients at Signature Columbia to help those patients develop, recover, and improve the skills needed for daily living and working.

50.     Relators' immediate supervisor was the Rehabilitation Service Manager ("RSM") for Signature Columbia, who was responsible for setting and managing the schedule of all physical therapists, occupational therapists, and speech-language therapists at the Signature Columbia facility.

51.     In addition to serving as a manager, the RSM was always a practicing therapist – physical, occupational, or speech-language – who was assigned a case load of his or her own.

52.     During this period, Chris Long, Signature's Regional Operational Officer with responsibility for the Signature Columbia facility (i.e., the regional manager), also played an active part in day-to-day management of the facility. Specifically, his involvement included reviewing and modifying the work schedules of the therapists and checking that the therapists were all meeting their productivity requirements.

- 12 -

53.     The fraudulent schemes set forth in this Complaint all arise from Signature's deliberate manipulation of therapist work schedules. Specifically, Signature, through Regional Operational Officer Chris Long and several successive RSMs, has consciously set therapist work schedules to maximize Medicare payments without any regard for the actual needs of Signature's patients.

54.     Signature assigned therapists to work with patients who did not need therapy, or who needed far less therapy than was being provided, for the sole purpose of bumping that patient into a higher category of per diem reimbursement.

55.     At the same time, Signature strictly limited the amount of time that therapists could spend with patients who genuinely needed therapy once providing therapy to that patient ceased to be profitable for Signature.

56.     As part of this scheme, Signature also permitted and tacitly encouraged its RSMs to bill Medicare for therapy services that the RSMs never actually provided.

57.     Relators have each reported these schemes to their superiors and through the Signature internal compliance program. This internal reporting did contribute to the termination of one RSM, a man named Jeremy Fralix, but Signature never took any steps to stop the underlying pattern and practice of fraudulent billing.

58.     Accordingly, Relator Emerson reported this fraud to the Office of the Inspector General for the Department of Health and Human Services ("HHS OIG") through that organization's Medicare Fraud hotline. Relator Tuesca has also spoken to investigators working for HHS OIG, and Relators ultimately filed this *qui tam* Complaint.

## DEFENDANTS' SCHEMES TO DEFRAUD

### I.  DEFENDANTS BILL MEDICARE PART A FOR UNNECESSARY THERAPY SERVICES

#### A.  General Scheme

59.     During their time working at Signature Columbia, Relators have observed – and have been subjected to – significant and increasing pressure on therapists to provide medically unnecessary therapy to Part A patients.

60.     The purpose of this unnecessary therapy has been to push patients into higher RUG categories – *i.e.*, to increase the per diem reimbursement paid by Medicare to Signature for those patients.

61.     This pressure on therapists to provide unnecessary therapy became particularly acute starting in mid-2013, when Valerie Simmons took over as the RSM for the Signature Columbia facility.  Under her management, and the management of her successor, Jeremy Fralix, therapy schedules were specifically set to maximize Medicare billing – with no regard for the actual needs of the patients.

62.     When therapists – such as Relators – objected that particular patients could not tolerate the amount of therapy for which they had been scheduled, the RSMs ignored the therapists' requests and sometimes took the additional step of threatening the therapists' jobs.

#### B.  Example of Fraudulent Part A Billing – Patient D.W.

63.     On Friday, May 16, 2014, RSM Simmons came into the facility gym – where most of the physical and occupational therapy takes place and where the therapists have their desks – and yelled at therapist Shawana Canty about patient D.W.[2]  Patient D.W. had not completed all of his scheduled therapy and was therefore at risk of falling into a lower RUG

---

[2]     For the sake of patient privacy, patients will be identified in this Complaint solely by first and last initial.

category for the assessment period, which would mean lower per diems for Signature. Relator Emerson was in the gym at this time working at her desk and overhead Ms. Simmons yelling.

64. RSM Simmons then approached Relator Emerson and ordered her to perform 30 minutes of therapy with patient D.W. before the end of the day, given that it was the "last day of assessment" and if patient D.W. did not have 30 additional minutes of therapy he would not hit the threshold for his projected RUG category.

65. Relator Emerson refused this request, noting that she had already seen patient D.W. that day and that there was no legitimate medical reason to see him again, and that the patient was in any event refusing to engage in any additional therapy that day.

66. RSM Simmons then yelled at Relator Emerson: "[Y]ou can get the 30 minutes or find another place to work!" or words to that effect, before storming out of the gym.

67. Relator Emerson did not perform the 30 additional minutes of therapy with patient D.W., and RSM Simmons ultimately did not fire her. However, on Monday, May 19, 2014, RSM Simmons wrote her up for "insubordination" and forced her to undergo a coaching and counselling session.

68. Additionally, Relator Emerson later checked the charts for patient D.W. and found that RSM Simmons had retroactively added two 15-minute therapy sessions for the patient. Ms. Simmons certified that she had performed this therapy personally. This fraudulent certification of 30 additional minutes of therapy that was never performed allowed patient D.W. to hit Signature's RUG target for him for that assessment period.

- 15 -

**C.      Fraudulent Billing Continues After Jeremy Fralix Takes Over as RSM**

69.      Ms. Simmons was promoted to a position at Signature Corporate, and her last day at the Signature Columbia facility was August 29, 2014.  However, the pressure to provide unnecessary therapy continued under her hand-picked successor as RSM, Jeremy Fralix.

70.      During a department meeting on September 17, 2014, several therapists, including Relators, voiced their concerns about being asked to perform inappropriate therapy.

71.      Relator Tuesca raised a specific concern related to patient J.Y.  Relator Tuesca had been working with this patient the previous day (September 16), but he fell during therapy and was not able to complete all of his scheduled minutes.  When Relator Tuesca came into the facility the following morning (*i.e.*, the same day as the department meeting), she learned from Relator Emerson that patient J.Y. had been assigned to see Relator Emerson for 120 minutes that day.  One hundred and twenty minutes was much more occupational therapy than patient J.Y. typically received, and was the exact amount needed to hit the 720 minute mark to have him categorized as an "RU" – the highest RUG category for reimbursement purposes.

72.      Relator Tuesca stated her belief during the department meeting that 120 minutes of therapy in a day was never clinically appropriate for patients such as J.Y.

73.      Regional Operational Officer Chris Long, who was participating by telephone, brushed off these concerns, stating that the RUG distribution at the facility was comparable to the standard distribution at Signature – with 70% of rehab patients classified as RU, the highest level, 20% as RV, the next highest level, and the remaining 10% classified as RH, RM, or RL, the three lowest levels.

74. Chris Long also noted during that meeting that he reviewed patient therapy records each week with RSM Fralix, and that what really concerned them was when they saw patients barely missing the target for the next highest RUG level.

75. Regional Operational Officer Chris Long specifically asked the therapists during that meeting: "Why don't you just put RU and move, when you're ten minutes away?"

76. From this meeting, it was clear that Regional Operational Officer Long and RSM Fralix did not care about actual patient needs, and instead set therapist schedules to maximize the RUG scores for as many Part A patients as possible.

77. RSM Fralix made this lack of concern for actual patient needs even more apparent in an email sent to therapists on September 9, 2014. In that email, he admonished therapists for not hitting the RU and RV category thresholds for enough patients, stating that "[w]e need to have 90% of Med A in RU and RV, we are currently at 80%"

78. These arbitrary therapy goals demonstrate that Signature was making decisions about how much therapy to provide based on purely self-interested economic criteria.

79. The situation at Signature Columbia improved slightly – but only slightly – after Jeremy Fralix was fired as RSM on September 29, 2014.

80. His successors, interim RSM Joel Burde and full-time RSM Joe Pickavance, who currently holds that position, have been better managers and have been more concerned about providing therapy based on the actual needs of the residents.

81. However, even under these RSMs, Regional Operational Officer Chris Long has been the ultimate authority regarding patient therapy, and he has continued to prioritize hitting the highest possible RUG scores above meeting the needs of Signature Columbia's patients.

- 17 -

82.     Accordingly, the practice of providing unnecessary therapy to Part A patients simply to obtain higher reimbursement rates continues to this day.

### D.     Specific Examples of Providing Unnecessary Therapy to Obtain Higher Reimbursements

83.     In addition to the general scheme to defraud described above, Relators are aware of numerous specific examples of Signature proving unnecessary therapy to patients simply to hit a targeted number of minutes.

84.     Patient L.A. was a Signature Columbia resident covered by Medicare Part A during the summer of 2014.  He was scheduled for a patient assessment on July 7, 2014, which would establish his RUG level for that payment period.  According to his physician's orders, patient L.A. was only supposed to receive occupational therapy five times a week.  However, to ensure that patient L.A. hit the 720 minute threshold for the Ultra High RUG category, Signature Columbia scheduled a 6th occupational therapy session for him that week, on Saturday July 19, 2014.  That session lasted 55 minutes.  Not coincidentally, that extra 55 minutes was *exactly* enough to hit the 720 minute mark for the assessment period.  That extra 55 minutes was also medically unnecessary, and was in fact against physician's orders.

85.      Patient B.C. was a Signature Columbia resident covered by Medicare Part A in the fall of 2013.  He was scheduled for a patient assessment on Friday, October 11, 2013, which would establish his RUG level for that payment period.  Patient B.C. was only scheduled to receive 40 minutes of occupational therapy on October 11.  However, patient B.C. did not have any physical therapy scheduled for that day, even though he usually had 30-35 minutes each weekday.  Without any physical therapy on October 11, patient B.C. was projected to fall just below the 500 minute threshold necessary to put him in the Very High RUG category for that period.  To ensure that patient B.C. hit the 500 minute mark for that assessment period, RSM

- 18 -

Simmons required an occupational therapist to work with patient B.C. for 75 minutes on October 11, even though he was only scheduled for 40 minutes that day.

86.     The additional 35 minutes of occupational therapy was exactly enough to hit the 500 minute threshold for patient B.C. for that assessment period, putting him into the RV (*i.e.*, "Very High") RUG category rather than the RH (*i.e.*, "High") category.

87.     Patient I.D. was covered by Medicare Part A in the spring of 2013.  She was scheduled for a patient assessment on Friday, June 13, 2013, which would establish her RUG level for that payment period.

88.     Signature Columbia manipulated her therapy schedule in order to precisely hit the 720 minute mark for that assessment period.  For example, patient I.D. received 80 minutes of occupational therapy on June 11, 2013, when only 60 minutes was scheduled.  Then, on June 13th itself, patient I.D. was scheduled for and received exactly 77 minutes of occupational therapy, a strangely specific number that was the exact amount needed to hit the 720 minute mark.

89.     As these examples demonstrate, Signature Columbia's RSMs and Regional Operational Officer Chris Long consistently set and manipulated therapist schedules in order to provide unnecessary therapy to Part A patients that pushed them into higher RUG categories than they would otherwise have been in.

**E.     Specific Examples of Withholding Necessary Therapy**

90.     In addition to providing unnecessary therapy to obtain greater reimbursement from Medicare, Signature also knowingly withheld and reduced scheduled therapy from patients when providing that therapy ceased to be profitable.

- 19 -

91.     Patient L.S. was a Signature Columbia resident covered by Medicare Part A in February of 2015.  She was scheduled for her first seven-day assessment (other than her intake assessment) on February 17, 2015.  During this first week, patient L.S. was initially scheduled for 40-50 minutes of both physical therapy and occupational therapy per day.  However, due to interactions with her medication, patient L.S. was unable to attend either of her therapy sessions on Saturday, February 14, or her occupational therapy session on Sunday, February 15 – resulting in a total of 90 minutes of scheduled therapy missed.

92.      At that point, it was clear that patient L.S. would not be able to hit the 500 minute mark necessary to put her into the "Very High" category for the assessment period.  However, continuing to provide her with all of the her scheduled therapy for the next two days would result in her having much more therapy than she needed to put her in next lowest RUG category, the High (RH) category.

93.     Accordingly, Signature scaled back patient L.S.'s scheduled therapy to only 20 minutes each of physical and occupational therapy on Monday, February 16, and only 15 minutes each on Tuesday, February 17.   This was below the level she should have been receiving.  Patient L.S. ended the assessment period with 339 total minutes of therapy, just above the threshold for the High RUG group, which was 325 minutes.

94.     From Signature's perspective, it was more profitable to lower the amount of therapy provided to patient L.S. during the last two days of the assessment period, as that resulted in less "wasted" therapy time – *i.e.*, therapy over and above the threshold for one RUG category, but not enough to reach the next higher RUG category.

95.      Likewise, patient H.P. was covered by Medicare Part A in February of 2015, with an assessment date of February 17, 2015.  Patient H.P. was initially scheduled to receive 50

- 20 -

minutes each of physical therapy and speech-language therapy on February 17, which was consistent with what he had been receiving up until that point.

96.     However, because patient H.P had already hit the 720 minute mark on February 16, putting him into the highest RUG category, Signature had no financial incentive to provide him with any additional therapy on February 17.  Accordingly, his scheduled minutes were reduced from 50 to 15 minutes each for physical and speech-language therapy.

97.     More damningly, the RSM instructed therapists not to provide even these reduced minutes of therapy to patient H.P.  As a result, Signature completely withheld therapy from patient H.P. on February 17, 2015 for the sake of its own bottom line.

98.     At a more general level, Relators are aware of numerous patients who repeatedly received the *exact* number of total minutes necessary to hit a particular RUG threshold.  As a practical matter, this often meant that the patient would receive too much therapy at certain times and not nearly enough at others.

### F.     Examples of Signature Falsely Classifying Patients as "Strict Isolation"

99.     Most patients receiving rehabilitation services during their periods of Part A coverage are categorized as "Rehabilitation" Patients.  However, under certain limited circumstances, a patient receiving rehabilitation services will be categorized as "Rehabilitation Plus Extensive Services."

100.     These "Rehab Plus" patients receive therapy the same way that Rehabilitation patients do, and are still categorized as RU, RV, RH, RM, or RL, depending upon the amount of therapy they receive.  However these, patients also receive one of three additional services during their period of Part A coverage:  (1) tracheostomy care; (2) ventilator or respirator care; or (3) infection isolation.

- 21 -

101. Skilled nursing facilities are compensated at much higher prospective per diem rates for these "Rehab Plus" patients.

102. Relators are aware that Signature often misclassified patients as "infection isolation," for the purpose of obtaining the higher "Rehab Plus" rates for those patients.

103. For example, Relators are aware of two Part A patients at Signature Columbia, Patient M.O. and Patient R.B., who were categorized by Signature as strict isolation patients who did not leave their rooms other than for doctor visits.

104. However, both of these patients would go out and smoke during all five smoke breaks each day. Nursing staff saw these patients outside smoking, but still categorized them as "strict isolation" patients.

## II. DEFENDANTS' SCHEME TO BILL FOR UNNECCESSARY PART B THERAPY

### A. General Scheme

105. Providing physical, occupational, and speech-language therapy to patients covered by Medicare Part A was far more lucrative for Signature than providing such services to patients covered by Medicare Part B, so those Part A patients were always the higher priority for the RSM and Regional Operational Officer when setting therapist work schedules.

106. However, the exact mix and number of patients at the Signature Columbia facility fluctuated, and during certain periods of time there were relatively few Part A patients in residence.

107. During these periods, the RSM, acting under the direction of the Regional Operational Officer, would add patients covered by Medicare Part B onto therapist work schedules, allowing therapists to keep their productivity up during slow times.

108.     Keeping productivity up was important for the individual therapists, as productivity – measured as the percentage of total time worked spent on billable therapy time – was a key criteria by which Signature evaluated them.

109.     Likewise, Regional Operational Officer Chris Long put intense pressure on the RSM to ensure that the therapists were meeting their productivity goals.

110.     Accordingly, during periods when the total number of patients at Signature Columbia was low, therapists were pressured to provide unnecessary therapy to Medicare Part B patients as a way to keep productivity up.

111.     Rebecca Stewart, who served as RSM at the Facility in 2012 before RSM Simmons, actually resigned over this very issue.

112.     Relator Tuesca was friends with RSM Stewart, and was specifically told by RSM Stewart that she was receiving pressure from Chris Long to make her therapists pick up more Part B patients and see them five times a week, regardless of whether that was medically appropriate for the particular patients.  At one point, Chris Long put RSM Stewart on an "action plan" – a form of company discipline – for not requiring her therapists to pick up more Part B patients.

113.     RSM Stewart considered that practice to be unethical and chose to resign her position rather than force the therapists she managed to perform unnecessary therapy.

114.     Subsequent RSMs such as Valerie Simmons and Jeremy Fralix had no such ethical qualms.

115.     As with the Part A patients described above, Signature made decisions about which Part B patients to schedule for therapy and how much therapy to schedule for them without any true regard for the actual needs of those patients.

- 23 -

116.     Many of the Part B patients that Signature Columbia scheduled for therapy during these down times had no need for therapy or alternatively were incapable of benefitting from it.

**B.      Specific Examples**

**(i)      Patient R.G.**

117.     For example, patient R.G. was a Medicare Part B patient added back into the case load for physical therapists on February 5, 2015, during a period when Signature Columbia had fewer than 100 of its 181 beds filled.  Patient R.G. had previously been discharged from therapy four weeks earlier due to his dementia and declines in function.

118.     Despite these declines in function, Signature Columbia began scheduling him for physical therapy again in early February, for 60-75 minutes per day, five days a week.

119.     Given his condition, it was not medically appropriate for patient R.G. to receive *any* physical therapy, and it was certainly not appropriate to schedule him for an hour or more each weekday.

120.     Accordingly, Signature knowingly provided and billed for worthless services with respect to patient R.G.

**(ii)      Patient M.A.**

121.     Relators are also aware that RSM Valerie Simmons personally provided unnecessary occupational therapy to Part B patient M.A. on a fairly regular basis over the course of at least three months.

122.     Patient M.A. had no discernable physical disability, but suffered from severe dementia.

- 24 -

123.    As a result of this dementia, patient M.A. was incapable of retaining any instructions from therapists, and was therefore incapable from meaningfully benefiting from occupational therapy.

124.    Despite the fact that occupational therapy was clearly not medically reasonable for patient M.A., RSM Simmons regularly provided and billed for such therapy with patient M.A.

### (iii)    Patient J.W.

125.    During Relators' time working at Signature Columbia, patient J.W. has been on and off the Part B patient case load at least three different times, despite her severe dementia.

126.    Patient J.W. initially received occupational and physical therapy during a 49-day period of Part B coverage beginning April 25, 2013 and ending June 11, 2013.

127.    On or about June 11, 2013, patient J.W. was briefly hospitalized, returning to Signature Columbia on or about June 14, 2013.

128.    Because of her hospital stay, all physical therapy received by patient J.W. for the next 100 days was included in the Part A per diem payments made by Medicare to the facility.

129.    Notably, patient J.W. remained in the highest RUG category, RU, for her entire 100 days of Part A coverage.

130.    On September 20, 2013, patient J.W.'s Part A coverage ended and Signature stopped providing her with any therapy, despite the fact that she remained in the facility.

131.    Nothing about patient J.W.'s medical status changed between September 20, 2013 and September 21, 2013.  However, once her Part A coverage ended, providing therapy was not as lucrative to Signature, so patient J.W.'s physical and occupational therapy was abruptly discontinued.

- 25 -

132.     Approximately two and a half months later, on December 9, 2013, the facility began providing physical therapy to patient J.W. again, obtaining reimbursement under Medicare Part B.  The overall caseload at the facility was relatively low in December 2013, so patients such as J.W. were added back to the caseload to help keep productivity up.

133.     Patient J.W. remained on the caseload until March 6, 2014.

134.     Later, on May 7, 2014, patient J.W. was again returned to the caseload for 31 additional days, to June 6, 2014.

135.     From Relators' experience, there had been no meaningful changes in the patient's physical or mental conditions to justify these wild swings between periods of no therapy and periods of excessive therapy.

136.     Instead, decisions about when to take patient J.W. back onto the therapy caseload have been entirely driven by the need to keep productivity up during periods when there have been fewer total patients at the facility.

137.     In March of 2015, the overall caseload was again low at the facility.

138.     Accordingly, Relator Emerson and other therapists at the facility have been approached again about adding patient J.W. back onto the caseload.

## III.     NOT BILLING CO-PAYS FOR PART B THERAPY

139.     Closely related to Defendants' scheme to provide and bill for unreasonable Part B therapy is Defendants' scheme not to bill beneficiaries for their Part B co-pays.

140.     Under Medicare Part B, most covered goods and services – including physical, occupational, and speech-language therapy – are 80% paid by Medicare, with the remaining 20% the responsibility of the beneficiary.

- 26 -

141. One basic purpose of the 20% co-pay is to ensure that beneficiaries take an active roll in monitoring their medical care to make sure that services being billed on their behalf are reasonable and necessary. The idea is that a patient will be more likely to challenge an unreasonable Part B charge if the patient is responsible for paying some portion of the charge herself.

142. Accordingly, a provider's deliberate failure to bill beneficiaries for their co-pays constitutes a form of kick-back and is actionable under the FCA.

143. In this case, Signature knew that billing co-pays to a beneficiary – or in many cases to a family member with power of attorney for that beneficiary – for unreasonable Part B therapy would prompt unwanted questions and challenges.

144. To avoid these challenges while continuing to bill Medicare for unnecessary Part B therapy, Signature consciously chose not to bill co-pays to its Part B patients.

145. Specifically, Signature did not bill co-pays directly to patients. For patients who had some form of supplemental insurance, *i.e.*, an insurance plan that paid the Part B co-pays, Signature would sometimes bill those co-pays, as the insurance companies were far less likely to challenge the reasonableness of the therapy being provided than the beneficiary or a family member with power of attorney.

- 27 -

## IV.    BILLING FOR SERVICES NOT RENDERED

### A.    In General

146.    In addition to serving as RSMs at Signature Columbia, Valerie Simmons and Jeremy Fralix were also therapists with their own case loads and productivity requirements, which were set at only slightly lower levels than the productivity requirements for the other therapists at the facility.

147.    Ms. Simmons was an occupational therapist and Mr. Fralix was a speech-language therapist.

148.    In practice, meeting these productivity requirements while also fulfilling their managerial duties was not possible for these RSMs.  However, instead of pushing back against Regional Operational Officer Chris Long, who set their productivity requirements, the RSMs often met their productivity goals by over-reporting the amount of therapy they provided to patients, and in some cases by recording and billing time for patients who they never saw at all.

149.    Billing the United States for services not actually rendered is one of the most basic and clear cut forms of fraud under the FCA.

### B.    Specific Examples

150.    During the summer of 2013, Relators and several of their therapist colleagues – Josie Castaneda, and Shawana Canty – became concerned that RSM Simmons was billing for patients during times when she could not possibly have been seeing patients.

151.    Accordingly, on August 5, 2013, Relators and their two colleagues made it a point to keep detailed notes of Ms. Simmons' whereabouts and compare them to her billing logs for that day.

- 28 -

152.    Based on the personal observations and notes of Relators and their two colleagues, Ms. Simmons met with Brooke Walters, Director of Clinical Services, from 7:30 a.m. until 11:25 a.m., when the two of them left the facility together to have lunch at a nearby Ruby Tuesday restaurant.  They returned to the facility at 12:48 p.m., and Ms. Walters left the facility shortly thereafter.

153.    Despite the fact that she could not possibly have seen patients during these time periods on August 5, 2013, Ms. Simmons recorded therapy minutes in the official Signature billing database, known as Optima, for at least three patients during this same window of time.

154.    Specifically, Ms. Simmons claimed to have provided occupational therapy to patient C.A., a Medicare Part B beneficiary, from 7:49 a.m. to 10:41 a.m.; to patient N.W., a Medicare Part B beneficiary, from 11:09 a.m. to 11:49 a.m.; and to patient J.P, a Medicare Part A beneficiary, from 11:53 a.m. to 12:53 a.m.

155.    These claims were all false and fraudulent.

156.    RSM Simmons would also sometimes add minutes of therapy retroactively to patient charts when a patient was close to meeting but had not quite hit the necessary number of minutes for the next highest RUG category.

157.    For example, as noted in a prior section of this Complaint, RSM Simmons retroactively added 30 minutes of occupational therapy for patient D.W. in March of 2014 that was never actually performed.  This fraudulent certification of therapy minutes allowed patient D.W. to exactly hit the 720-minute threshold to put him in the Ultra High RUG category for that assessment period.

158.    Relators are also aware that RSM Simmons entered therapy minutes into the Optima system for patients she claimed to have seen on June 8, 2014, despite the fact that she

- 29 -

was at the CMA Music Festival that entire day. Specifically, RSM Simmons billed 415 total minutes, or 29 units, of occupational therapy for six different patients covered by Medicare Part B.

159. Relator Emerson was actually present at Signature Columbia on June 8, 2014, and did not see RSM Simmons there at any point that day.

160. Moreover, Relator Emerson later found a picture of RSM Simmons at the CMA Music Festival in a Facebook post from that same date.

161. When Jeremy Fralix took over as RSM in September of 2014, he continued Ms. Simmons' pattern of recording time and billing for therapy services he never provided.

162. In fact, Fralix had been fraudulently recording billable time for patients he had not seen even before he was formally promoted to RSM.

163. For example, on August 22, 2014, Fralix recorded that he spent 43 minutes with Medicare Part A patient E.C., from 8:03 a.m. to 8:46 a.m. However, his Daily Treatment Log reflects that he also claimed to have seen commercial insurance patient W.A. on that same same day, from 8:03 a.m. to 8:33 a.m., an overlap of 33 minutes. Moreover, physical therapist Glendalyn Fodra also recorded providing therapy to patient E.C. during that same period of time that morning, from 8:10 to 9:00 a.m.

164. Likewise, on August 27, 2014, Fralix recorded that he spent 45 minutes with Medicare Part A patient M.W., from 10:30 a.m. to 11:15 a.m. However, physical therapist Jessica Edelen also reported seeing that patient during that same period of time that morning, from 10:04 a.m. to 10:54 a.m.

165. On September 1, 2014, Fralix recorded that he spent 45 minutes with Medicare Part A patient S.M., from 11:00 a.m. to 11:45 a.m. However, the treatment logs of physical

therapist Glendalyn Fodra and Relator Tuesca show that Ms. Fodra saw patient S.M. from 10:13 a.m. to 11:03 a.m. that morning, and that Relator Tuesca saw patient S.M. from 11:33 a.m. to 11:48 a.m. that morning. Accordingly, Fralix could not have seen patient S.M. for all of the time that he claimed, and probably did not see patient S.M. at all.

166.     Relators are aware that patient S.M. and patient E.C. have both stated to multiple therapists at the facility, including both Relators and Josie Castaneda, that they have never done any therapy with Fralix, despite the fact that he claims to have provided speech-language therapy to each of them on multiple occasions. In fact, patient S.M. stated that she did not know she was on the speech-language caseload at all.

167.     RSM Fralix was ultimately terminated from his position at Signature Columbia on September 29, 2014.

168.     For about a month and a half, there was no RSM at Signature Columbia, though therapist Josie Castaneda took over many of the responsibilities of the position on an informal basis. Then, on November 10, 2014, Signature Corporate sent Joel Burde to serve as interim RSM until a permanent RSM could be hired.

169.     The new full-time RSM, Joe Pickavance, started work on December 1, 2014, and remains RSM as of the date of filing this Complaint. Unlike RSM Fralix or RSM Simmons, Relators are not aware of RSM Pickavance ever billing time for patients he has not seen.

170.     In fact, RSM Pickavance spoke informally with Relator Emerson several times about the pressure he was under to maintain unreasonably high productivity numbers for himself while also serving as the RSM.

171.     Specifically, RSM Pickavance mentioned to Relator Emerson that Regional Operational Officer Chris Long frequently compared RSM Pickavance unfavorably against prior

- 31 -

RSM Valerie Simmons, who was able to maintain a productivity rate of above 90% most months.

172.    Relator Emerson has told RSM Pickavance that Ms. Simmons' high productivity numbers were due, in large part, to her billing for patients who she never actually saw.

**RELATORS REPORT FRAUD, ARE STYMIED BY SIGNATURE**

173.    Throughout their employment at Signature Columbia, Relators Emerson and Tuesca have each tried to uncover and stop the fraudulent practices they have observed.

174.    Signature, however, has never taken Relators' allegations seriously, and has never taken any meaningful steps to change its practices.

175.    Signature, in fact, has repeatedly harassed and retaliated against both Relators when they have attempted to raise these issues internally.

176.    As a result, Relators have reported on these fraudulent practices to HHS OIG.

177.    HHS OIG initially put Relator Emerson in touch with representatives of AdvanceMed Corp. ("AdvanceMed"), a company that works under a contract with HHS OIG to investigate allegations of fraudulent Medicare billing. Relator Emerson remains in active contact with representatives of AdvanceMed and has affirmatively turned over hundreds of pages of patient records and other documents substantiating her claims of fraudulent billing.

178.    During this same period, Relator Tuesca has also regularly communicated with these representatives of AdvanceMed regarding the fraudulent conduct she has observed.

I.    **RELATORS REPORT VALERIE SIMMONS' FRAUDULENT BILLING**

179.    As early as June 2013, Relators reported internally on the fraudulent conduct they were observing at Signature Columbia.

- 32 -

180. Specifically, on June 26, 2013, Relators, together with fellow therapists Josie Castaneda and Shawana Canty, reported to Regional Operational Officer Chris Long and Director of Clinical Services Brooke Walters that Valerie Simmons had been fraudulently billing Medicare for patients she had not seen.

181. Chris Long arrived at the building that same afternoon and conducted what he described as an "investigation" into the allegations. Relators each provided witness statements, as did Shawana Canty. Relators are also aware that Chris Long spoke to patient A.A., one of the individuals Relators had identified as a patient RSM Simmons billed for without ever seeing.

182. The next day, patient A.A. specifically told Relators that she had spoken to Chris Long and told him that she had never worked with RSM Simmons. Despite this clear evidence, Chris Long informed Relators, also the next day, that the allegations were unfounded and that he was closing the investigation.

183. A little over a month later, on August 5, 2013, Relators and the other therapists personally observed RSM Simmons spending time in meetings and out of the office and then billing for therapy during those periods of time when she could not possibly have provided it.

184. Relators and the other two therapists brought this information to the Director of Nursing for Signature Columbia, Debbie Garris. Relators chose not to bring the matter to Chris Long or Brooke Walters, as Chris Long and Brooke Walters had already made clear in June that they were not going to take these allegations against RSM Simmons seriously.

185. Relators brought additional information to Director Garris on August 6, 2013, showing that RSM Simmons had again billed for therapy that she could not possibly have provided.

- 33 -

186. Two days later, on August 8, 2013, Devin Shelby, the administrator for the Signature Columbia facility, called all of the facility's therapists into a meeting. April Myhan, the recently hired HR Director for the facility, was in attendance, and Regional Operational Officer Chris Long and Kelly Heldgeson of Signature Rehab both participated by phone. Ms. Heldgeson said that anyone who knew about recently reported allegations of false billing should stay, and that everyone else could leave. Shawana Canty and Josie Castaneda stayed for a few minutes, but then left, leaving Relators Emerson and Tuesca as the only therapists in the meeting.

187. For the remainder of that meeting, Mr. Long and Ms. Heldgeson told Relators and the other two therapists that the accusations were unfounded, while also telling them that they had an obligation to come forward with any information they had.

188. Relator Emerson specifically asked Chris Long why he closed his investigation without speaking to any relevant witnesses. Mr. Long did not provide any reasonable justification, though he continued to insist that his investigation had been thorough.

189. Relator Emerson also specifically stated during this meeting that she did not believe that her claims were being taken seriously and voiced her concerns that she was going to face retaliation.

190. After this meeting, Relators did not notice any changes in the policies or practices at Signature Columbia. However, later that month, Valerie Simmons and Chris Long shut down a program that Relator Emerson had spent considerable time developing, called the revolution room. Given the timing and the fact that Relator had never previously heard any complaints regarding this program, the decision to shut down the revolution room was almost certainly an act of retaliation by Chris Long and Valerie Simmons.

- 34 -

## II.     RELATORS REPORT JEREMY FRALIX'S FRAUDULENT BILLING

191.    In light of the hostile reception Relators faced after reporting on Valerie Simmons' fraudulent billing during the summer of 2013, Relators did not formally raise the issue again for over a year.

192.    However, on September 23, 2014, Relators Emerson and Tuesca jointly reported on the fraudulent conduct they had been observing, along with harassment and retaliation that they had been subjected to by Jeremy Fralix and Chris Long since Fralix was named RSM at the beginning of that month.

193.    Relators described this fraud in formal grievances they each submitted to the HR Administrator for the facility, April Myhan.  These grievances contained detailed descriptions of names, dates, and times that substantiated the claims of Medicare fraud.

194.    Ms. Myhan, in turn, forwarded this information to Kim Syzmanski, the facility administrator for Signature Columbia; Tiffany Cardwell, HR Administrator for Signature Rehab; and Jean Stiles, the Corporate Compliance Officer for Signature Consulting.

195.    RSM Fralix was fired on September 29, 2014.  Notably, in the communications sent to therapists by Regional Operational Officer Chris Long, the stated reason for RSM Fralix's termination was poor productivity.  No mention was made of fraudulent billing.

196.    At about the same time that RSM Fralix was fired, Relators were each contacted by Tiffany Cardwell, HR Administrator for Signature Rehab, asking to set times to interview each of them by phone.

197.    Relator Emerson spoke by phone with Ms. Cardwell on October 2, 2014 and was reassured by Ms. Cardwell that Relator Emerson's allegations were being taken seriously and

- 35 -

were being investigated. Ms. Cardwell also spoke by phone with Relator Tuesca that day and provided similar reassurances.

198.    Several days later, on October 7, 2014, Jean Stiles, Corporate Compliance Officer for Signature Consulting, sent a "compliance blast" through the internal server to all department heads at the Signature Columbia facility, reminding them about the need to prevent fraudulent billing.

199.    On October 9, 2014, Chris Long held a department meeting for therapists and provided them with a training sheet and video regarding fraudulent billing.

200.    However, nothing at the facility changed with respect to therapists being required to provide unnecessary therapy to patients simply to increase the per diem reimbursement rates.

201.    On November 25, 2014, Jean Stiles, Corporate Compliance Officer for Signature Consulting, met separately with both Relator Emerson and Relator Tuesca to address their respective concerns regarding fraudulent billing. Ms. Stiles adopted a very reassuring tone during these meetings and emphasized that proper steps were being taken to ensure proper billing and training going forward.

202.    Ms. Stiles also indicated that Signature had "backed out" the fraudulent time entries and charges submitted by Jeremy Fralix and not collected reimbursement from Medicare for them.

203.    Given the amount of time that had passed since RSM Fralix submitted his false claims, Relators were skeptical of Ms. Stiles' claim that Signature had not been reimbursed for RSM Fralix's fraudulent charges, particularly since Ms. Stiles also insisted that there was no merit to Relators' earlier, and arguably much more serious, allegations against Valerie Simmons. Ms. Stiles never gave any clear reason why she felt the allegations against RSM Simmons lacked

- 36 -

merit; she just stated that she felt that Chris Long's original investigation had been done properly.

204.    Despite Relators' lingering concerns, the meetings with Ms. Stiles ended on a generally positive note, and Ms. Stiles emphasized to each Relator that if she had further concerns she should contact Ms. Stiles directly.

205.    The next day, facility administrator Kim Syzmanski held a therapy department meeting and sharply criticized therapists who had raised concerns about performing high volumes of therapy.  Ms. Syzmanski specifically stated that "I am not going to name names, but you know who you are."

206.    Ms. Syzmanski further stated during this meeting that anyone who believed that fraudulent billing was taking place should contact her, and only her, and that anyone who failed to do so or who reported their concerns through another channel would be fired.

207.    Given the conflicting information that Relators were receiving from Ms. Stiles and Ms. Syzmanski, Relators each reached back out to Ms. Stiles by email on December 2, 2014, noting their concerns about Ms. Syzmanski's directive that therapists not report suspected fraud to anyone but Ms. Syzmanski.

208.    Ms. Stiles never substantively responded to these concerns, and instead just suggested generally to each Relator that she give her new managers time to make everything right.

209.    On December 17, 2014, Ms. Stiles showed up at the Signature Columbia facility unexpectedly and once again met separately with Relators Emerson and Tuesca.  Also present at these meetings were Heather Howe, HR Director, and Christine Busby, Vice Present of Clinical for Signature Rehab.

- 37 -

210. During these meetings, Ms. Stiles again asserted that the allegations against Valerie Simmons were unfounded and that all proper steps had been taken to deal with fraudulent billing by Jeremy Fralix. Ms. Stiles also stated that from that point forward, if either Relator had concerns about fraudulent billing, she was to bring those concerns to the new RSM for the facility and to Regional Operational Officer Chris Long, rather than to Ms. Stiles directly.

211. A little over a month later, on January 23, 2015, Relator Emerson was asked to resign from her position at Signature in exchange for an extremely modest severance package.

212. To date, Relator Emerson has refused to resign from Signature, as Signature's attempts to coerce her resignation are further acts of retaliation and attempts to cover up the fraud that Relator has reported.

213. In February of 2015, Signature drastically cut back Relator Tuesca's hours. Prior to February 2015, Relator Tuesca had regularly worked forty or more hours per week. However, after the reduction in her hours, Relator Tuesca has typically worked no more than 10 hours per week, and never for more than 20 hours per week.

214. This reduction in Relator Tuesca's hours, like the efforts to coerce Relator Emerson into resigning, was retaliation for efforts to stop Signature's fraudulent actions.

## III. RELATORS REPORT FRAUD TO HHS OIG

215. Given Signature's failure to take any meaningful steps to address the fraud that Relators had reported internally, Relators decided to report this fraud directly to the United States, beginning in September of 2014.

216. On September 24, 2014, Relator Emerson called Julio Griffin, an auditor for HHS OIG, and described all of the past and ongoing fraudulent acts that she had observed at Signature.

217.     One month later, Relator Emerson was contacted by a woman named Lisa Stewart from AdvanceMed.   Ms. Stewart explained that her company contracted with HHS OIG to investigate fraud and that Relator's allegations had been referred to AdvanceMed for investigation.

218.     Since that time, Relator Emerson has been in regular and continuing contact with representatives of AdvanceMed, first through Ms. Stewart and then through a different investigator named Whitney Telschaw.  Relator Emerson also put Ms. Telschaw in contact with Relator Tuesca, in or around December of 2014.

219.     During this period, Relator Emerson has disclosed all of the documentation and other evidence that has come into in her possession that supports her claims of fraud against the United States.

220.     During this period, Relator Tuesca has also regularly reported on and provided documents regarding the fraudulent conduct that she has observed during her time at Signature.

221.     Based in large part on the evidence provided by Relators, AdvanceMed conducted an on-site audit of Signature Columbia on March 2 and March 3, 2015.

222.     To the best of Relators' knowledge, that investigation is ongoing as of the filing of this Complaint.

## DEFENDANTS' FRAUDULENT SCHEMES EXTEND BEYOND THE SIGNATURE COLUMBIA FACILITY

223.     Although Relators both worked for Signature exclusively at its Columbia, Tennessee facility, the fraudulent practices they allege are not limited to that nursing home.

224.     Chris Long, the Regional Operational Officer who directed and oversaw many of the fraudulent practices described above, had oversight responsibility for the following 12 additional facilities:

- 39 -

a. Bluegrass Care and Rehabilitation in Lexington, Kentucky;

b. Nashville Community Care & Rehabilitation Center at Bordeaux, in Nashville, Tennessee;

c. Signature HealthCARE of Clarksville in Clarksville, Tennessee;

d. Signature HealthCARE of Cleveland in Cleveland, Tennessee;

e. Donelson Place Care & Rehabilitation Center in Nashville, Tennessee;

f. Hermitage Care and Rehabilitation Center in Owensboro, Kentucky;

g. Mayfair Manor in Lexington, Kentucky;

h. Signature HealthCARE of Bowling Green in Bowling Green, Kentucky;

i. Signature HealthCARE of Elizabethtown in Elizabethtown, Kentucky;

j. Signature HealthCARE at Hillcrest in Owensboro, Kentucky;

k. Signature HealthCARE at Larkin Springs in Madison, Tennessee; and

l. Signature HealthCARE of Georgetown in Georgetown, Kentucky.

225. Additionally, Relator Emerson is good friends with an occupational therapist who splits her time between Signature Columbia and Donelson Place Care & Rehabilitation Center in Nashville, Tennessee ("Signature Donelson"), one of the facilities managed by Chris Long.

226. Relator Emerson has learned from this therapist that the RSM at Signature Donelson, Molly Patton, was terminated from her position in December of 2014, after being caught fraudulently billing speech-language therapy for patients she had not seen.

227. From Relator Emerson's conversations with her friend at the Signature Donelson facility, it is Relator Emerson's understanding that RSM Patton was pressured by Chris Long to bill for patients she did not see, in much the same way as the RSMs at Signature Columbia were pressured.

- 40 -

228.	Moreover, as set forth in the previous section of this Complaint, Relators Emerson and Tuesca both fully disclosed their allegations of fraud to senior managers at Signature – specifically Corporate Compliance Officer Jean Stiles and HR Administrator Tiffany Cardwell.

229.	While this internal reporting may have lead, or at least contributed, to the termination of RSM Jeremy Fralix, Signature refused to pursue or meaningfully investigate the fraud committed by Valerie Simmons, or the more widespread fraudulent practice of manipulating therapist schedules for the express purpose of maximizing the reimbursements received for Medicare patients.

## COUNT I

**Worthless Services Billed to Medicare Part A and Medicare Part B by Defendants,**
**in Violation of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(A)**

230.	Relators reallege and incorporate the above paragraphs as if fully set forth herein.

231.	At all times relevant to this Complaint, Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment for Medicare Part A patients receiving rehabilitative care at Signature nursing facilities.

232.	Specifically, Defendants sought and received inflated prospective per diem payments for Medicare Part A patients, based on Defendants' practice of providing unnecessary therapy services simply to boost the patients' reimbursement level.

233.	At all times relevant to this Complaint, Defendants also knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States through the Medicare Part B Program, including claims for therapy provided to residents of Signature rehabilitation facilities that were neither reasonable nor necessary for those residents.

234.	Defendants billed for these unreasonable Part B therapy minutes in order to maintain revenue levels during periods when revenues from Part A patients were down, without

any regard for whether the therapy being provided to particular Part B patients was medically appropriate.

235.     By virtue of the false or fraudulent claims presented, or caused to be presented by Defendants, the United States has suffered damages.

236.     Defendants are joint and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants.

## COUNT II

### Billing Medicare Part A and Part B for Services Not Rendered, in Violation of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(A)

237.     Relators reallege and incorporate the above paragraphs as if fully set forth herein.

238.     At all times relevant to this Complaint, Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment for Medicare Part A patients receiving rehabilitative care at Signature nursing facilities.

239.     Specifically, Defendants sought and received inflated prospective per diem payments for Part A patients, based on Defendants' practice of reporting and billing for more minutes of therapy than Defendants actually provided to patients.

240.     For patients who were close to but had not hit the threshold for the next higher billing category (*i.e.*, RUG Group), Defendants added minutes of therapy to patients' charts that did not correlate to actual minutes of therapy provided to the patients.  Defendants added these fraudulent minutes to patients' charts for the sole purpose of hitting the billing thresholds and billing Medicare for higher per diem rates.

- 42 -

241.     Additionally, RSMs, including Signature Columbia RSMs Valerie Simmons and Jeremy Fralix, recorded therapy time for patients for whom they had never actually provided therapy.

242.     At all times relevant to this Complaint, Defendants also knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States through the Medicare Part B Program, seeking reimbursement for units of therapy that Defendants had not actually provided.

243.     By virtue of the false or fraudulent claims presented, or caused to be presented by Defendants, the United States has suffered damages.

244.     Defendants are joint and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants.

## COUNT III

### Creation and Use of False and Fraudulent Documents
### Material to the United States' Decisions to Pay Claims, in Violation of the
### Federal False Claims Act, 31 U.S.C. §3729(a)(1)(B)

245.     Relators reallege and incorporate the above paragraphs as if fully set forth herein.

246.     At all times relevant to this Complaint, Defendants have knowingly used, or caused to be made or used, false records or statements material to their false and fraudulent claims for payment to the United States.

247.     Such false records include, without limitation, patient MDSs that fraudulently overstate the number of compensable minutes of therapy provided to that patient during the seven-day assessment period.

248.     These false and fraudulent representations were material to the United States' decision to reimburse Defendants at particular per diem rates for particular patients.

- 43 -

249. Accordingly, by virtue of the false and fraudulent records knowingly made, used, or caused to be made or used by Defendants, the United States has suffered damages.

250. Defendants are joint and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants.

## COUNT IV

**Retention and Concealment of Overpayments Made Under Medicare Parts A and B in Violation of the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(G)**

251. Relators reallege and incorporate the above paragraphs as if fully set forth herein.

252. Defendants knowingly concealed or knowingly and improperly avoided their obligations to pay or transmit money to the United States by failing to repay amounts received from the United States for services that Defendants knew had never been rendered.

253. Defendants knew that the United States had paid for therapy services billed by Signature RSMs but that had never been performed by those RSMs.

254. Defendants also knew that that the United States had paid for therapy services under both Medicare Part A and Medicare Part B that Defendants knew were not medically reasonable.

255. By virtue of Defendants' knowing concealment and avoidance of their obligations to pay money to the United States, the United States suffered damages.

256. Defendants are joint and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants.

- 44 -

## COUNT V

**Retaliation against Relator Emerson in Violation of the
Federal False Claims Act, 31 U.S.C. §3730(h)**

257.    Relators reallege and incorporate the allegations in the above paragraphs as if
fully set forth therein.

258.    At all times relevant to this Complaint, Defendants, acting as an integrated
enterprise, have jointly employed Relator Emerson as an occupational therapist.

259.    Chapter 31, §3730(h) of the United States Code protects employees, contractors,
and agents, from being "discharged, demoted, suspended, threatened, harassed, or in any other
manner discriminated against in the terms and conditions of employment because of lawful acts
done by the employee, contractor, [or] agent . . . in furtherance of an action under this section or
other efforts to stop 1 or more violations of this subchapter."

260.    Prior to filing this FCA lawsuit, Relator Emerson reported on and attempted to
stop Signature from defrauding the United States.  Specifically, Relator Emerson has reported
Signature's illegal activities to Signature managers, including, without limitation, Regional
Operational Officer Chris Long; Facility HR Administration April Myhan; HR Administrator for
Signature Rehab Tiffany Cardwell; and Corporate Compliance Officer for Signature Consulting
Jean Stiles.

261.    Instead of taking the necessary corrective action, Signature has repeatedly
retaliated against Relator Emerson.

262.    In August of 2013 – soon after Relator Emerson had reported RSM Valerie
Simmons' fraudulent billing to Regional Operational Officer Chris Long and Director of Clinical
Services Brooke Walters – Chris Long and Valerie Simmons retaliated against Relator Emerson
by shutting down the revolution room.  The revolution room was a project that Relator Emerson

- 45 -

had personally planned and implemented to allow patients to complete some of their scheduled therapy in the activity room, rather than the therapy gym. Chris Long and Valerie Simmons knew that Relator Emerson had spent considerable time and effort establishing the revolution room and took great pride in it. Accordingly, they shut it down in order to retaliate against her for raising her concerns regarding fraudulent billing.

263.    In January of 2014, Relator Emerson received a relatively negative performance evaluation from RSM Valerie Simmons, which was done in retaliation for Relator Emerson's attempt to stop RSM Simmons' practice of fraudulent billing. Prior to January of 2014, Relator Emerson had received perfect scores on her yearly evaluations, and there were no legitimate factors justifying a downward departure.

264.    On May 19, 2014, Relator Emerson received a written reprimand from RSM Simmons for "insubordination," as retaliation for Relator Emerson's public refusal to perform 30 minutes of unnecessary therapy on a patient just so that the patient could hit his RUG target for the assessment period.

265.    On August 29, 2014 – RSM Simmons' last day at the facility before taking on a new job at Signature – RSM Simmons filled out and submitted a false and malicious witness statement to the facility administrator claiming that Relator Emerson had performed electronic muscle stimulation (commonly known as "e-stim") without prior physician approval and without documenting her work.

266.    On September 3, 2014, Relator Emerson was called into a meeting with new RSM Jeremy Fralix to discuss the allegation, with Director of Clinical Services Brooke Walters participating by phone.

- 46 -

267. Relator Emerson vehemently denied having ever performed e-stim on the patient, and noted that a physical therapist named Glendalyn Fodra sometimes provided e-stim – with physician approval – to patients that Relator Emersion also saw. Relator Emerson further stated that she believed that the allegations against her had been made in retaliation for her prior reports of fraud against RSM Simmons and that she should have the opportunity to submit a rebuttal statement.

268. On September 4, 2014, Relator Emerson faxed a rebuttal statement to Director of Clinical Services Walters explaining why the allegations against her were unfounded and retaliatory. Neither RSM Fralix nor Director of Clinical Services Walters ever addressed the allegations against Relator Emersion again, and Relator still does not know whether there has been any final resolution of the claim against her.

269. On September 9, 2014, Relator Emerson was called into a meeting with Director of Clinical Services Walters to address a witness statement that RSM Fralix had submitted against Relator Emerson and dated September 1, 2014. Notably, neither RSM Fralix nor Director of Clinical Services Walters had even mentioned this witness statement during the meeting on September 3, 2014.

270. In the statement, RSM Fralix alleged that he had observed Relator Emerson attempting to apply warm paraffin to a patient's shoulder without prior approval. This allegation, like the e-stim allegation, was completely unfounded.

271. Director of Clinical Services Walters did not give Relator Emerson any opportunity to draft a rebuttal statement. Instead, a final written warning was simply placed in Relator Emerson's personal file, based on little more than the retaliatory accusations.

- 47 -

272. A little over a week later, on September 17, 2014, Relator Emerson spoke up during a department meeting, expressing her concern that the facility was forcing therapists to perform unreasonable and unnecessary therapy just to meet their productivity goals and get patients into high per diem reimbursement categories.

273. Two days later, on September 19, 2014, Relator Emerson received an email message from Regional Operational Officer Chris Long, informing her that she was being placed on a "two week action plan" because of low productivity numbers for the month so far. Of course, the only reason that Relator Emerson's productivity numbers were down was because she had been forced to spend so much time in meetings addressing the retaliatory statements RSM Fralix and prior RSM Simmons had submitted against her.

274. On September 23, 2014, Relator Emersion, together with Relator Tuesca, filed formal grievances with facility HR Director April Myhan asserting harassment and retaliation against Chris Long, Valerie Simmons, Jeremy Fralix, and Signature as a whole. These grievances set forth Relators' allegations of fraudulent billing by former RSM Simmons, as well as other examples of fraudulent billing they had observed and Signature's lack of response.

275. Over the next several months, Relator Emerson spoke with several different company officials, including Jean Stiles and Tiffany Cardwell, regarding these allegations. However, no meaningful steps were taken to address the fraud Relators had identified.

276. On November 11 and 12, 2014, inspectors from the Tennessee licensing board were on site at Signature Columbia and spoke with all of the therapists. Relator Emerson expressed her concerns about fraudulent billing at this time, as did Relator Tuesca.

277. On November 26, 2014, facility administrator Kim Syzmanski called a department meeting where she was intensely critical of therapists who were not working

- 48 -

cooperatively with their past two RSMs. Ms. Syzmanski said that she would not name names but that "you know who you are."

278. On December 17, 2014, Jean Stiles showed up unexpectedly at the facility and asked to meet with Relator Emerson. Also present at the meeting were Heather Howe, from Signature HR and Christine Busby. At this meeting, Jean Stiles stated that the allegations of fraud against Ms. Simmons were unfounded, though she declined to elaborate. Ms. Howe then stated that the two write-ups in Relator Emerson's file would stay there, though the second write-up would be knocked down from a final to initial write-up. Relator Emerson stated that she did not accept that outcome and would continue to fight the two write-ups, as they were completely unfounded.

279. On January 14, 2015, RSM Joe Pickavance performed Relator Emerson's yearly evaluation, giving her 3 out of 4 in two categories, and 4 out of 4 in four categories.

280. On January 23, 2015, two vice presidents for Signature Rehab, Christine Busby and Spencer Smith, met with Relator Emerson regarding her two write-ups and her grievance. During that meeting both Vice Presidents told Relator Emerson that it was inappropriate for her to continue bringing these issues up, and ended the meeting by handing Relator Emerson a severance agreement for her consideration.

281. One of the terms of this agreement was a statement expressly affirming that Relator Emerson did not know of any fraud taking place at Signature.

282. Relator was given thirty days to consider the agreement.

283. Four days later, Relator Emerson received a new performance evaluation from Tracie Witherspoon, the Clinical Regional Director. Ms. Witherspoon did not provide any clear

explanation for why she was redoing the evaluation, given that RSM Pickavance had performed his yearly evaluation just a few days earlier.

284. Whereas RSM Pickavance had given Relator Emerson all 3s and 4s, Ms. Witherspoon gave her an overall score of only 2.2. Relator Emerson specifically asked why she was being given such a low score and was told that it was based in large part on her write-ups and her low productivity earlier in the year – both of which resulted directly from the retaliatory conduct Relator Emerson had faced for reporting fraud.

285. On February 13, 2015, Relator Emerson officially declined to accept the severance package Signature had offered, as she was unwilling to sign a document stating that she was not aware of any fraudulent billing.

286. Since that time, Relator has been under increasing pressure to either resign or to engage in fraudulent conduct.

287. Specifically, on February 17, 2015, Chris Long set new productivity standards for the facility – as well as the other facilities under his direction – and Relator Emerson's productivity goal was set at 96%. This level of productivity is, for all practical purpose, impossible to hit without engaging in billing fraud.

288. These acts of retaliation were done as a result of Relator's lawful acts done in furtherance of this action, including refusing to engage in Defendants' fraudulent and illegal schemes to provide and bill for unnecessary services in violation of federal law.

289. Pursuant to 31 U.S.C. §3730(h), Relator is entitled to all compensation necessary to make her whole for Defendants acts of retaliation, including litigation costs and reasonable attorney's fees incurred in pursuit of her retaliation claim.

- 50 -

## COUNT VI

### Retaliation against Relator Tuesca in Violation
### of the Federal False Claims Act, 31 U.S.C. §3730(h)

290. Relators reallege and incorporate the allegations in the above paragraphs as if fully set forth therein.

291. At all times relevant to this Complaint, Defendants, acting as an integrated enterprise, have jointly employed Relator Tuesca as an occupational therapist.

292. Chapter 31, Section 3730(h) of the United States Code protects employees, contractors, and agents, from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, [or] agent . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter."

293. Prior to filing this FCA lawsuit, Relator Tuesca reported on and attempted to stop Signature from defrauding the United States. Specifically, Relator Tuesca has reported Signature's illegal activities to Signature managers including, without limitation, Regional Operational Officer Chris Long; Facility HR Administration April Myhan; HR Administrator for Signature Rehab Tiffany Cardwell; and Corporate Compliance Officer for Signature Consulting Jean Stiles.

294. Instead of taking the necessary corrective action, Signature has repeatedly retaliated against Relator Tuesca.

295. On August 29, 2014 – RSM Simmons' last day at the facility before taking on a new job at Signature – RSM Simmons filled out a false witness statement to the facility administrator claiming that Relator Tuesca had knowingly permitted Relator Emerson to perform e-stim on a patient without prior physician approval and without documenting her work.

296. On September 3, 2014, Relator Tuesca, together with Relator Emerson, was called into a meeting with new RSM Jeremy Fralix to discuss the allegation, with Regional Director of Clinical Services Brooke Walters participating by phone. Relator Tuesca vehemently denied the allegation, noting that she had never seen Relator Emerson performing e-stim.

297. On September 9, 2014, Relator Tuesca was called into another meeting with Director of Clinical Services Walters to address a witness statement that RSM Fralix had submitted against Relator Tuesca and dated September 1, 2014.

298. In the statement, RSM Fralix raised two distinct allegations against Relator Tuesca: (1) that she had backdated a patient order for a patient she had not seen, and (2) that she had interfered with an ongoing internal investigation. Specifically, the allegation was that Relator Tuesca was interviewing patients herself regarding allegations that RSM Simmons had been billing for services she had not provided, rather than allowing the internal investigation to take its course.

299. With respect to the first allegation, Relator Tuesca acknowledged that she had issued a *retroactive* order – which was not something she had ever attempted to hide – but vehemently denied that she had backdated an order. The difference between a retroactive order and a backdated order is that a retroactive order expressly acknowledges that it is being entered after the effective date (*i.e.*, "order signed 1/1/15 effective as of 12/15/14") while a backdated order does not. Relator Tuesca also emphasized that she had never received any guidance stating that entering retroactive orders was against Signature policy.

300. With respect to the second allegation, Relator Tuesca vehemently denied interfering with any internal investigation, as there was no investigation taking place at that time. She also specifically noted that the patient she was accused of "interviewing" had been

- 52 -

reassigned to her after RSM Simmons left, and that Relator Tuesca was simply asking this patient questions about her status and treatment history in order to provide effective therapy to her.

301.    Relator Tuesca was told at this meeting if she did anything similar again, she would be fired.

302.    A little over a week later, on September 17, 2014, Relator Tuesca spoke up during a department meeting, expressing her concern that the facility was forcing therapists to perform unreasonable and unnecessary therapy just to meet their productivity goals and get patients into high per diem reimbursement categories.

303.    Two days later, on September 19, 2014, Relator Tuesca received an email message from Regional Operational Officer Chris Long, informing her that she was being placed on a "two week action plan" because of low productivity numbers for the month so far.  Of course, the only reason that Relator Tuesca's productivity numbers were down was because she had been forced to spend so much time in meetings addressing the retaliatory statements RSM Fralix and prior RSM Simmons had submitted against her.

304.    On September 23, 2014, Relator Tuesca, together with Relator Emerson, filed formal grievances with facility HR Director April Myhan asserting harassment and retaliation against Chris Long, Valerie Simmons, Jeremy Fralix, and Signature as a whole. These grievances set forth Relators' allegations of fraudulent billing by former RSM Simmons, as well as other examples of fraudulent billing they had observed and Signature's lack of response.

305.    Over the next several months, Relator Tuesca spoke with several different company officials, including Jean Stiles and Tiffany Cardwell, regarding these allegations. However, no meaningful steps were taken to address the fraud Relators had identified.

- 53 -

306.     On November 11 and 12, 2014, inspectors from the Tennessee licensing board were on site at Signature Columbia and spoke with all of the therapists.   Relator Tuesca expressed her concerns about fraudulent billing at this time, as did Relator Emerson.

307.     On November 26, 2014, facility administrator Kim Syzmanski called a department meeting where she was intensely critical of therapists who were not working cooperatively with their past two RSMs.  Ms. Syzmanski said that she would not name names but that "you know who you are."

308.     On December 17, 2014, Jean Stiles showed up unexpectedly at the facility and asked to meet with Relator Tuesca.  Also present at the meeting were Heather Howe, from Signature HR and Christine Busby.  At this meeting, Jean Stiles stated that the allegations of fraud against Ms. Simmons were unfounded, though she declined to elaborate.  Ms. Howe then stated that the write-up in Relator Tuesca's file would stay there, though it would be knocked down from a final to initial write-up.

309.     On January 29, 2015, RSM Relator Tuesca had her yearly performance evaluation with Joe Pickavance and Tracie Witherspoon.  Relator Tuesca received a much worse evaluation than she had in prior years, which Relator Tuesca believes was in retaliation for her continuing attempts to stop fraudulent billing.  Moreover, for ostensibly objective categories where she received low scores – most notably productivity – Relator Tuesca was effectively being punished for the time she had to spend meeting with company managers regarding her allegations of fraud as well as the retaliatory allegations against her, all of which counted against her productivity requirements for the year.

310.     A few weeks later, on or about February 17, 2015, Relator Tuesca was told that her hours were being dramatically cut back to approximately 10 per week.  While Signature

Columbia was operating with considerably less than its normal patient census at that time, Relator Tuesca was the only experienced therapist whose hours were reduced.

311.    The only other therapist whose hours were reduced on or about February 17, 2015, was Lauren Davenport, a new occupational therapist who had been at the facility for less than three months.

312.    Relator Tuesca was specifically targeted for this reduction in hours because of the fraudulent billing she had reported.

313.    These acts of retaliation were done as a result of Relator's lawful acts done in furtherance of this action, including refusing to engage in Defendants' fraudulent and illegal schemes to provide and bill for unnecessary services in violation of federal law.

314.    Pursuant to 31 U.S.C. §3730(h), Relator is entitled to all compensation necessary to make her whole for Defendants acts of retaliation, including litigation costs and reasonable attorney's fees incurred in pursuit of her retaliation claim.

## PRAYER FOR RELIEF

Relators respectfully request that this Court enter judgment against all Defendants as follows:

A.      That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as provided by the FCA, 31 U.S.C. §3729 *et seq.*

B.      That civil penalties of $11,000 be imposed for each and every false claim that Defendants presented to the United States;

C.      That pre- and post-judgment interest be awarded;

D.      That the Court grants permanent injunctive relief to prevent any recurrence of violations of the FCA for which redress is sought in this Complaint;

- 55 -

E. That Relators be awarded the maximum percentage of any recovery allowed to them pursuant to the FCA, 31 U.S.C. §3730(d)(1) and (2);

F. That Relators be awarded all costs and expenses of this action, including statutory attorneys' fees, expenses, and costs as permitted by 31 U.S.C. §3730(d); and

G. That this Court awards such other and further relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Relators, on behalf of themselves and the United States, demand a jury trial on all claims alleged herein.

DATED: March 27, 2015

/s/ _____

DAVID W. GARRISON (TN Bar # 024968)
SETH M. HYATT (TN Bar # 031171)
BARRETT JOHNSTON MARTIN
   & GARRISON, LLC
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Phone – (615) 244-2202
Fax – (615) 252-3798
dgarrison@barrettjohnston.com
shyatt@barrettjohnston.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
ROBERT K. LU*
655 West Broadway, Suite 1900
San Diego, CA 92101
Phone – (619) 231-1058
Fax – (619) 231-7423
rlu@rgrdlaw.com

*Pro Hac Motion forthcoming

ROBBINS GELLER RUDMAN
   & DOWD LLP
JAMES E. BARZ*
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Phone – (312) 674-4674
Fax – (312) 674-4676
jbarz@rgrdlaw.com

*Pro Hac Motion forthcoming

*Attorneys for Plaintiffs-Relators*